## Sales of Alcoholic Beverages to Soldiers

Department of Justice. Opinion to Hon. Frederick B. Kerr, Adjutant General.

MARGIOTTI, Attorney General, May 21, 1935. — We have your request to be advised with respect to the following questions:

1. Are the acts of Congress that prohibit the sale of beer, wines and liquors in post exchanges and canteens, upon any premises used for military purposes by the United States, in full force and effect, and, if so, are they applicable to the State military reservations at Indiantown Gap and Mt. Gretna when used by the Pennsylvania National Guard in their summer encampments?

2. Is it unlawful for licensees in Pennsylvania to sell intoxicating liquors to members of the National Guard while in uniform?

You inform us that the Pennsylvania Liquor Control Board has issued regulations, binding upon licensees, which prohibit the sale of any intoxicating liquors to members of the military forces while in uniform.

After a careful review of the Acts of Congress, we find that the acts of Congress and parts thereof that are pertinent to your inquiry are as follows:

The Act of Congress of February 2, 1901, 31 Stat. at L. 748, sec. 38, which reads, in part, as follows:

"The sale of or dealing in, beer, wine or any intoxicating liquors by any person in any post exchange or canteen or army transport or upon any premises used for military purposes by the United States, is hereby prohibited. The Secretary of War is hereby directed to carry the provisions of this section into full force and effect."

The Act of Congress of May 18, 1917, 40 Stat. at L. 76, sec. 12, which reads, in part, as follows:

"That the President of the United States, as Commander in Chief of the Army, is authorized to make such regulations governing the prohibition of alcoholic liquors in or near military camps and to the officers and enlisted men of the Army as he may from time to time deem necessary or advisable: . . . It shall be unlawful to sell any intoxicating liquor, including beer, ale, or wine, to any officer or member of the military forces while in uni-

form, except as herein provided. Any person, corporation, partnership, or association violating the provisions of this section of the regulations made thereunder shall, unless otherwise punishable under the Articles of War, be deemed guilty of a misdemeanor and be punished by a fine of not more than $1,000 or imprisonment for not more than twelve months, or both."

We have been unable to find any statute specifically repealing the Act of 1901, above quoted, and we find that the War Department regards this act and the regulations thereunder, as promulgated by the Secretary of War, in full force and effect.

There can be no question as to the full force and effect of the Act of 1917, above quoted, for Circuit Judge Walker, speaking for the Circuit Court of Appeals of the Fifth Circuit in Laughter v. United States, 261 Fed. 68 (1919), stated, in part, as follows:

"Nothing in the terms of the act shows that the whole of it was intended to be effective only for the period of the war in which the country was engaged at the time the act was passed. . . . The authority of the President, as Commander-in-Chief of the Army, to make regulations governing the prohibition of alcoholic liquors in or near military camps, is conferred without limitation as to the time of its exercise. This being true, it is not necessary to determine whether the war in which the United States was engaged had or had not ended when the acts charged in the third and fourth counts were done".

Whether or not the Act of 1901 is applicable to the State military reservations at Indiantown Gap and Mt. Gretna depends upon whether or not the military reservations are being used for military purposes by the United States when the Pennsylvania National Guard is using the reservations for its summer training periods, which in turn depends upon whether the National Guard of Pennsylvania is, during those training periods, in the service of the United States, or whether while at their

training camps at the reservations they retain their entity as the National Guard of Pennsylvania.

Prior to the National Defense Act of June 3, 1916, 39 Stat. at L. 166, and its several amendments, it is clear that the National Guard was a State organization, then called the State militia, organized primarily to suppress internal disturbances within the State.

Upon the enactment of the National Defense Act and its amendments by Congress, a very material change was wrought with respect to the National Guard of Pennsylvania. It effected a unification of the National Guard with the Federal army and strengthened it from the standpoint of efficiency. It did not, however, destroy or weaken its character as a distinctive State organization. In times of peace the State retains precisely the same control over the National Guard as it did over the militia.

If Congress had intended to destroy the militia which has existed as a distinct organization since the origin of our government, it would have done so in express language and not by mere inference.

By the provisions of section 1 of the National Defense Act as amended June 4, 1920, 41 Stat. at L. 759, it is provided as follows:

"That the Army of the United States shall consist of the Regular Army, *the National Guard while in the service of the United States,* and the Organized Reserves, including the Officers' Reserve Corps and the Enlisted Reserve Corps." (Italics ours.)

The Supreme Court of Wisconsin in passing on this question said in State v. State Industrial Comm., 186 Wis. 1, 5, 202 N. W. 191, in part as follows:

"Nowhere in the act can be found a provision which in times of peace alters the control which the state has over the Guard. Had such an important and vital change been contemplated by Congress, affecting an institution having its origin at the very time of the inception of the government and which had continued for more than a century, it would not have left the matter subject to mere

inference; on the contrary, it would by its legislation have in express terms wiped out the very existence of the National Guard as a state institution and expressly made it a part of the federal army. The loyalty that we owe to the government and the respect which is due to Congress, a representative body of our people, forbid the unwarranted and violent assumption that under the National Defense Act any such radical change had been contemplated, based upon mere inference."

The Supreme Court of Nebraska, in passing upon this question in the case of Nebraska National Guard v. Morgan, 112 Neb. 432, 199 N. W. 557 (1924), said:

"While the Nebraska National Guard is subject to the call of the federal government and thereupon becomes a part of the national army, until so called it is essentially a state institution, subject to the call of the governor as commander in chief for military service within the state in time of war, invasions, riots, rebellion, insurrection, or reasonable apprehension thereof (Comp. St. 1922, sec. 3322), and is a state governmental agency."

Under our present National Defense Act the National Guard is only a potential part of the United States Army in time of peace, and the guard does not actually become a part of such army before it has been duly called into the service of the United States: 40 C. J. 669-670; Bianco v. Austin, 204 App. Div. 34, 197 N. Y. Supp. 328; State v. State Industrial Comm., 186 Wis. 1, 202 N. W. 191; Dig. Op. Judge Advocate-Gen. (April, 1913), p. 17.

We find that army regulations 130-15, dated November 1, 1934, provides that members of the National Guard of the United States shall not be in the active service of the United States except when ordered thereto in accordance with law and, in time of peace, they shall be administered, armed, uniformed, equipped, and trained in their status as the National Guard of the several States, Territories, and the District of Columbia.

Certainly the above quoted army regulation is clear and explicit in its terms and it indicates clearly and precisely

that in time of peace the guard shall be armed, administered, equipped and uniformed and trained not in their Federal status but in their status as the National Guard of the respective States.

When the National Guard of Pennsylvania is not in the service of the United States, the Governor has authority and is authorized and directed by section 5 of the National Guard Act of May 17, 1921, P. L. 869, as amended, which reads, in part, as follows:

". . . to alter, increase, divide, annex, consolidate, disband, organize, or reorganize any organization, department, corps, or staff, so as to conform, as far as practicable, to any organization, system, drill, instruction, corps or staff, uniform or equipment, or period of enlistment, now or hereafter prescribed by the laws of the United States and the rules and regulations promulgated thereunder for the organization and regulation of the National Guard."

Clearly these provisions, along with the other parts of the National Guard Act, show that the National Guard is primarily and essentially a State organization.

In workmen's compensation cases the courts have uniformly held that the National Guard is a State organization except as it may be called into the Federal service, so that a guardsman injured in connection with his duties in the National Guard of the State is an employe of the State within the compensation law: Opinions of the Attorney General of Pennsylvania (1925-1926), p. 330; Baker v. State, 200 N. C. 232 (1931), 156 S. E. 917; State v. Johnson, 186 Wis. 59 (1925), 202 N. W. 191.

That part of the amendment of the National Defense Act of June 15, 1933, c. 87, 48 Stat. at L. 153, which is pertinent, reads, in part, as follows:

"Section 4. Officers of the National Guard of the United States, while not on active duty, shall *not*, by reason solely of their appointments, oaths, commissions, or status as such, or any duties or functions performed or pay or allowances received as such, *be held or deemed to*

*be officers or employes of the United States,* or persons holding any office of trust or profit or discharging any official function under or in connection with any department of the Government of the United States.

"Section 5. The National Guard of the United States is hereby established. It shall be a *reserve component* of the *Army* of the United States and shall consist of those federally recognized National Guard units, and organizations, and all the officers, warrant officers, and enlisted members of the National Guard of the several States, Territories, and the District of Columbia, . . . .: *Provided,* That the members of the National Guard of the United States shall not be in the active service of the United States except when ordered thereto in accordance with law, and, in time of peace, they shall be administered, armed, uniformed, equipped, and trained in their status as the National Guard of the several States, Territories, and the District of Columbia. . . .

"Section 18. When Congress shall have declared a national emergency and shall have authorized the use of armed land forces of the United States for any purpose requiring the use of troops in excess of those of the Regular Army, the President may, . . . order into the active military service of the United States, to serve therein for the period of the war or emergency, unless sooner relieved, any or all units and the members thereof of the National Guard of the United States." (Italics ours.)

It is clear, after careful consideration is given to the acts of Congress, army regulations and laws above quoted, that the National Guard of Pennsylvania, when training in their summer encampments at the State military reservations located at Indiantown Gap and Mt. Gretna, do so in their capacity as a State organization and not as members of the Army of the United States.

They do not become members of the United States Army until Congress declares that a National emergency exists, and the President orders them into active military service of the United States.

In arriving at the above conclusion, we are not unmindful of the Act of April 12, 1875, P. L. 48, which reads, in part, as follows:

"Section 1. That it shall not be lawful for any person or persons to erect, place or have any booth, stall, tent, carriage, boat, vessel, or any other place whatever, for the purpose of selling, giving, or otherwise disposing of any spirituous, vinous or malt liquors, or cider, or any fermented liquors whatsoever, or any admixtures thereof, or any liquid compounded or composed, in whole or part, of alcohol, or any other intoxicating drink whatever, (except as hereinafter excepted,) within three miles of the place of holding any soldiers' encampment or re-union in this state, during the time of holding such encampment or re-union. . . .

"Section 5. The provisions of the first section of this act shall not apply to any person licensed to sell intoxicating liquors under the laws of this commonwealth, who may sell or dispose of the same at his or her usual place of business named in such license, and in accordance with law."

We also have given consideration to the Act of June 22, 1917, P. L. 628, which reads, in part, as follows:

"Section 25. The commanding officer of any troops in active service may place in arrest any officer or enlisted men who shall disobey the orders of his superior officer, or any person or persons who shall trespass on parade or camp grounds, or in any way or manner interrupt or molest the orderly discharge of duty of those in active service. He may also prohibit and prevent the sale of spirituous or malt liquors within two miles of such parade ground or encampment. He may abate as a nuisance all hucksters, auction sales, or gambling."

It is clear that section 1 of the Act of 1875 does not apply to any person holding a license issued by the Pennsylvania Liquor Control Board to sell intoxicating liquors in the Commonwealth because of the exemption contained in section 5 of this act. This is true even though the Act

of 1875 is in full force and effect and there is grave doubt as to whether or not this act at the present time is in effect.

The Supreme Court of Pennsylvania in Baker et al. v. Kirschnek et al., 317 Pa. 225, held that the Act of November 29, 1933, P. L. 15, which prohibits transactions in liquor in the State except by and under the control of the Liquor Control Board, repealed section 34 of the Act of March 11, 1850, P. L. 778. This was a local act prohibiting any person or persons from vending or selling spirituous or other intoxicating liquors within the limits of the Borough of Media, and is very analogous to the Act of 1875 quoted above. The court held that the Act of 1850 was repealed because it was inconsistent with the Act of 1933. For a like reason the Act of 1875 has been repealed.

It will be noted above that the commanding officer of the National Guard, under the Act of 1917, has the power to prohibit and prevent the selling of spirituous or malt liquors within 2 miles of the parade encampment.

You have not requested information concerning the status of the Essington rifle range and the Middletown aviation depot regarding the operation of canteens or post exchanges for the sale of intoxicating liquors. However, we respectfully suggest that inasmuch as these are Federal military reservations within the Commonwealth, the commanding general of the National Guard of Pennsylvania should issue specific orders that no sale of intoxicating liquors be permitted under any circumstances during the summer encampments upon these Federal reservations.

Therefore, we are of the opinion, and you are advised :

1. That the acts of Congress that prohibit the sale of beer, wines and liquors at post exchanges and canteens upon the premises used for military purposes by the United States, are in full force and effect, but they are not applicable to the State military reservations at In-

diantown Gap and Mt. Gretna when used by the Pennsylvania National Guard in their summer encampments.

2. That it is now unlawful for licensees in Pennsylvania to sell intoxicating liquor to members of the National guard while in uniform because of the present regulations of the Pennsylvania Liquor Control Board. However, the Pennsylvania Liquor Board may lawfully amend its present regulations and permit the lawful sale by licensees in Pennsylvania to members of the National Guard while in uniform. If and when these regulations are amended or supplanted, it will be legal for licensees in the Commonwealth to sell intoxicating liquors to members of the National Guard of Pennsylvania while in uniform.